UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHARLES CARPENTER,      )  NO. CV 05-5153-PA (JC)

        Petitioner,    )

                    )  REPORT AND RECOMMENDATION OF

     v.           )  UNITED STATES MAGISTRATE JUDGE

                    )

SCOTT KERNAN, Warden,    )

        Respondent.    )

_____)

This Report and Recommendation is submitted to the Honorable Percy Anderson, United States District Judge, pursuant to 28 U.S.C. Section 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.   SUMMARY

On July 14, 2005, petitioner Charles Carpenter ("petitioner"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 (the "Petition").[1]  Petitioner challenges, <u>inter</u> <u>alia</u>, a second degree murder conviction sustained in the Los Angeles County Superior Court on the following principal grounds:  (1) the evidence was insufficient to prove that petitioner acted with "express malice" or that he caused the victim's death; (2) petitioner

---

[1] Petitioner originally filed the Petition with the United States District Court for the Eastern District of California on June 23, 2005.  The case was transferred to, and filed in this district on July 14, 2005.

was deprived of due process and a fair trial due to the trial court's incomplete and incorrect jury instructions on causation; and (3) petitioner was denied his constitutional right to a have a jury find beyond a reasonable doubt facts used to impose upper term sentences on three charges.  (Petition at 6-7).[2]

---

[2]On October 20, 2007, the court denied petitioner's initial request to hold these proceedings in abeyance pending his exhaustion of additional claims.  (Docket No. 20).  On December 21, 2007, petitioner filed another "Motion to Hold Federal Habeas Corpus Petition in Abeyance Pending Exhaustion of Potentially Meritorious and Dispositive Claims in State Court" (the "Stay Motion").  The Stay Motion requests that the court hold the Petition in abeyance so petitioner can try to exhaust two "new" claims in state court alleging that: (1) petitioner was denied his due process rights when arresting police officers did not give him a drug or alcohol test to determine sobriety; and (2) petitioner was denied effective assistance of trial counsel due to counsel's failure to argue this claim to the trial court.  (Stay Motion at 8-9).  At the time petitioner filed the Stay Motion, petitioner asserted that he was prepared to go to the California Supreme Court within 90 days with a petition for writ of habeas corpus containing his unexhausted claims.  (Stay Motion 9).  A search of the California Supreme Court docket reflects that to date, petitioner has made no such filing.  Petitioner's Stay Motion should be denied.  A court may stay and hold in abeyance a habeas corpus petition pending exhaustion of state remedies in only "limited circumstances."  Rhines v. Weber, 544 U.S. 269, 277 (2005).  At a minimum, a petitioner seeking a stay must demonstrate good cause for petitioner's failure to exhaust his claims first in state court.  Even if good cause is shown, such a motion cannot be granted if the unexhausted claims are plainly meritless or if petitioner has engaged in abusive litigation tactics or intentional delay.  Id. at 277-78.  Here, petitioner fails to demonstrate good cause for his failure to exhaust his new claims first in state court.  The record also supports a finding that petitioner has engaged in intentional delay by failing expeditiously to pursue a petition with the California Supreme Court raising such claims.  Moreover, petitioner's "new" claims plainly lack merit.  Other than his general due process argument, petitioner has not identified, and the court is not aware of, any federal law establishing a constitutional right to a field sobriety test.  (Stay Motion at 8).  Police officers do not have an affirmative duty to investigate crimes in a particular manner.  Gini v. Las Vegas Metro. Police Dept., 40 F.3d 1041, 1045 (9th Cir. 1994) (citing DeShaney v. Winnebago County, 489 U.S. 189, 195-96 (1989)).  Nor do police have "an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution."  Arizona v. Youngblood, 488 U.S. 51, 58 (1988).  To establish a due process violation, petitioner must show that the police acted in bad faith to preserve potentially useful evidence.  Id.  Petitioner cannot do so here.  Moreover, this is not a case where petitioner is asserting that the police withheld material exculpatory evidence as would implicate Brady v. Maryland, 373 U.S. 83 (1963).  Petitioner simply claims the police should have conducted tests that may have aided his defense.  Without more, any failure to conduct a field sobriety test does not rise to level of constitutional error.  Further, petitioner's counsel was not deficient in failing to raise what would have been a nonmeritorious objection to the police's aforementioned omission.  But, even assuming counsel was deficient in this respect, there is no reasonable probability that the outcome of the trial would

On October 24, 2005, respondent filed an Answer to the Petition (the "Answer") and an accompanying exhibit ("Answer Ex. A").[3]  On September 12, 2006, petitioner filed a Reply (the "Reply").[4]

For the reasons discussed below, the Petition should be denied and this action dismissed with prejudice.

## II.    PROCEDURAL HISTORY

On June 25, 2003, a jury convicted petitioner of second degree murder (count one), corporal injury to a spouse (count two), assault with a deadly weapon (a car) (count three), and assault with a deadly weapon with (a knife) (count four) – all relating to petitioner's August 13, 2002 attack on his estranged wife, Laquenia Carpenter (the "victim").  (CT 185-88, 214-15).  The jury found true allegations that petitioner personally used a deadly weapon (the car and the knife), inflicting great bodily injury upon the victim.  (CT 185-88).

Petitioner appealed his conviction.  (Lodged Doc. A3).  On November 10, 2004 the California Court of Appeal affirmed the judgment of conviction.  (Exhibit A to Answer).  On February 23, 2005, the California Supreme Court denied petitioner's petition for review.[5]  (Lodged Docs. B1, B2).

Petitioner did not seek collateral review in state court.  (Petition at 4).  As indicated above, petitioner thereafter filed the instant Petition.

---

have been different if counsel had made such an objection.  See Strickland v. Washington, 466 U.S. 668, 694 (1984).

[3]Respondent also lodged multiple documents ("Lodged Doc."), including the Clerk's Transcript ("CT") and the Reporter's Transcript (RT).

[4]Petitioner's Reply is mistitled:  "Opposition to Motion to Dismiss."

[5]The California Supreme Court denied the petition for review without prejudice to any relief to which petitioner might be entitled after such court rendered decisions ultimately issued in People v. Black, 35 Cal. 4th 1238 (2005) (Black I), vacated by 127 S. Ct. 1210 (2007) and People v. Towne, 44 Cal. 4th 63 (2008).  (Lodged Doc. B2).

**III.    FACTS**

    **A.    Prosecution Case**

        **1.    Background, Offense Conduct, and Arrest**

Petitioner was married to, and had one child with the victim.  (RT 644, 674, 1314, 1333, 1347).  In August of 2002, the victim resided in Room 2 of the Deluxe Motel with her counsin, Leah Coleman, and two of the victim's children (including petitioner's child).  (RT 643, 645, 674-75, 723-24).  Petitioner did not then reside with the victim.  (RT 645).[6]

In August 2002, petitioner and the victim argued about another man, Dillard Jones, being in the victim's motel room, playing a video game with the victim's son.  (RT 653-54, 676-77).  Petitioner accused the victim of being unfaithful.  (RT 676-77).  The victim told petitioner that Jones was a friend of the family.  (RT 654, 676-77).  Petitioner started cursing, but left when the victim told him to leave.  (RT 655).

On August 13, 2002, petitioner returned to the victim's motel room and knocked on the door.  (RT 655-57, 677).  Petitioner's car was parked in front between rooms 2 and 3 of the motel.  (RT 657).  The victim went to the window at the front of her room and spoke with petitioner through the window.  (RT 658, 679).  Petitioner told the victim he wanted his money.  The victim told petitioner that she did not have any money.  (RT 658, 677, 679-80).  Petitioner then went to the victim's car and slashed her tires.  (RT 659, 680; see also RT 629, 639 (Pomona Police Detective Snyder testifying that two of the tires on the victim's car were slashed)).  The air coming out of the tires made a hissing sound.  (RT 659-60, 681-83).

The victim went outside and walked up behind the petitioner.  (RT 661, 680, 684).  The petitioner turned around and started hitting the victim in her face and "all on her side."  (RT 661, 685-87).  The victim backed away from petitioner and fell on the

---

[6]It was noted outside the presence of the jury that petitioner was paroled two weeks prior to the incident.  (RT 646-47).

ground.  (RT 661-62).  Petitioner then used a knife to stab the victim's right side three or four times.  (RT 662, 695).  The victim tried to get up from the ground but had difficulty doing so.  (RT 663-64).  Petitioner got in his car and backed the car over the victim, striking her.  (RT 664, 689).  Petitioner pulled the car forward then backed over the victim again.  (RT 664).  Petitioner pulled the car forward once again and backed over the victim.  (RT 665, 695).  The car finally stopped on top of the victim, with the car's tires spinning and smoke and exhaust coming  from the car.  (RT 665).  Petitioner got out of the car and walked away.  (RT 665-67, 669-70).

Petitioner's cousin/roommate Coleman screamed for help.  (RT 670, 690-91).  A neighbor from the motel and other people came to help push the car off the victim.  (RT 670-71).  The keys were gone from the ignition of the car.  (RT 670-71, 734).  With the car off the victim, observers could see a knife sticking out of her lower right side.  (RT 671-72, 693-94).[7]

---

[7]Although the foregoing facts were all testified to by Coleman, other neighbors gave similar reports.

Kelley Wilcox, a neighbor who was on probation for a misdemeanor drug offense, testified: She was living across the street from the Deluxe Motel on August 13, 2002. (RT 736-37). She heard frantic screaming that evening and looked to see a girl standing in the middle of the street, screaming as the girl was walking towards the motel. (RT 737-38). She looked where the girl was walking and saw a man's back and his arm going in a downward motion three or four times. (RT 738-39). She turned to two girls standing by a nearby pay phone and told one to call 911. (RT 739). She then looked back at the motel and saw reverse lights on a Cadillac that was attempting to back up. (RT 739). The car then went forward. (RT 740). At that point, the car was on top of a woman. (RT 740). Wilcox turned to look at the girls at the pay phone and when she looked back across the street there was nobody in the car. (RT 740). She stepped out in the street and flagged down a passing police car. (RT 740).

Candice Cooper, a prisoner in custody for possession of heroin, testified that she was staying at the Deluxe Motel on August 13, 2002. (RT 697-98). Cooper had used heroin that day. (RT 698-99). At some point, Cooper heard loud screaming and looked out her window to see someone laying in the driveway. (RT 700, 709-10). She watched as a man got in a car, backed up the car going really fast, and ran over the person in the driveway. (RT 701-02, 710-14, 717). It looked to Cooper like the man was trying to then go forward in the car but the car was stuck. (RT 702, 713-16). Cooper went to the car but by the time she got there the driver was gone. (RT 717). Cooper saw a woman stuck under the car. (RT 702-03). She could also see the knife sticking out of the woman's side. (RT 704).

Officers Elias Linn and Rochelle McCrary responded to the scene. The victim told Officer Linn that her husband did it and gave Officer Linn a description of petitioner. (RT 1273). Officer McCrary headed in the direction that petitioner was last seen running. (RT 1289-90). Within twenty minutes of responding to the motel, Officer McCrary found petitioner walking in the area. (RT 1290-91, 1296). Petitioner was told to put his hands in the air and to lie face down on the ground. (RT 1292-93). Petitioner complied. (RT 1292-93, 1298). Petitioner did not appear to have any difficulty understanding the officer. (RT 1293). Petitioner was breathing heavily and had perspiration on his face. (RT 1293-94). Officer McCrary acknowledged that, while perspiration and heavy breathing are observable symptoms of someone being under the influence of narcotics, there were no other symptoms present that she could see.[8] (RT 1294-95).

Pomona Police Detective Thomas Snyder photographed petitioner on the night of the incident while petitioner was in jail. (RT 958-59). Petitioner had a "fresh, slight small cut" on petitioner's right hand. (RT 960, 963). Petitioner was cooperative, appeared to understand the detective's requests, and did not appear to be under the

///

///

---

Martha Mascorro, another neighbor at the Deluxe Motel and a convicted felon, testified: She lived in room 7 of the Deluxe Motel with her husband in August of 2002. (RT 722-23). Petitioner had been introduced to Mascorro as the victim's husband. (RT 724). Mascorro occasionally bought cocaine from the victim and Coleman. (RT 731-33). On August 13, 2002, she heard screaming. (RT 725). She looked out and saw dark smoke coming from a Cadillac in the driveway and Coleman standing in the driveway. (RT 726-27, 729). She heard somebody under the car. (RT 727). She walked to the car and heard the victim asking for help. (RT 727-28). When she asked the victim who had done this to her, the victim replied: "My husband did. My husband." (RT 728). When the car was removed from the victim, Mascorro saw a knife in the victim's back on the right side. (RT 729).

[8]Officer Edil Vasquez was also present when petitioner was detained that night. (RT 1281). Officer Vasquez testified: Petitioner did not appear to be fidgeting. (RT 1282). He appeared to respond to commands. (RT 1282). He saw nothing about petitioner's behavior that caused the officer to suspect that petitioner was under the influence of drugs. (RT 1282).

influence of drugs.  (RT 961-62).  Detective Snyder did not administer any tests to determine if petitioner was under the influence of any drugs.  (RT 963-64).

### 2.   Medical Evidence

Dr. Peter Rhee, a trauma surgeon at the L.A. County Medical Center who treated the victim on the night of the attack, testified:   When the victim was brought to the emergency department, Dr. Rhee observed the victim laying face down with a large knife sticking out of her back.  (RT 970-72).  She was bleeding "all over the place" and had road abrasions consistent with being run over by a car.  (RT 971-72).   Dr. Rhee observed four stab wounds to the victim's body, including stab wounds to both breasts, and multiple stab wounds to her arm.  (RT 972-74, 980).  Dr. Rhee operated on the victim that evening.  (RT 974).  When he opened her abdomen, he observed spillage of her stomach and intestinal contents into her abdomen mixed with blood.  (RT 974-75).  There were a multitude of injuries. (RT 975).  The victim's liver and gallbladder were lacerated, as was her colon.  (RT 975-76).  Another stab wound went through the victim's stomach and into her spleen and cut her kidney.  (RT 976).  "[J]ust about every organ you can think of" was hit.  (RT 976).  Dr. Rhee repaired the victim's colon, removed her gallbladder and spleen, and irrigated her abdominal cavity to remove the spilled colon and stomach contents.  (RT 976-77).  During the course of surgery, the victim was given a blood transfusion and six or eight liters of fluid because about two-thirds of her blood volume had been spilled.  (RT 977-78).  Had the victim not received emergency surgery on the night of the attack, she would have died.  (RT 982).

Dr. Rhee further testified:  The victim suffered brain injuries as a result of losing so much blood.  (RT 978).  When she came out of the anesthesia two days after surgery, she could follow commands, but could not talk and could not move her body the way she wanted to move it.  (RT 979).[9]   The victim suffered an "anoxic brain injury" – parts of

---

[9]There was some disagreement over whether the victim was alert and oriented or talking before surgery.  A medical note indicated she was alert and oriented, but Dr. Rhee discounted the notation and said that the victim did not talk to him when she came to the emergency department.  (RT 985-86).

her brain were dead – from lack of oxygen from the initial assault.  (RT 979-80, 996).[10]
The victim had to be put on a ventilator or breathing machine and had a trachea tube put
in to help her breathe due to her injuries.  (RT 981).  The victim was eventually
transferred to Kaiser hospital for rehabilitative work due to her brain injury.  (RT 982).

Medical records from Kaiser hospital reflect that the victim had suffered anoxic
brain jury with weakness and paralysis on the right side of her body, left eye blindness,
and decreased hearing in the left ear due to the brain injury.  (RT 1005).

Rosemary Braucht, a registered at Kaiser hospital, testified:  She spoke with the
victim on the night the victim transferred to that hospital.  (RT 1247-50).  The victim
reported that her husband had caused her injuries.  (RT 1251).   The victim knew who
she was, knew where she was, recognized her family, and was awake and alert and able
to recognize her surroundings.  (RT 1259).

The victim was later transferred to Sun Bridge convalescent home.  (RT 1007).
On or about October 20, 2002, she was taken to the emergency room at the Pomona
Valley Medical Center with acute respiratory distress, an accelerated heart rate, an
elevated white blood count, and an elevated temperature.  (RT 1008-12).  On or about
the same date, she expired.  (RT 1014).

Dr. Ajay Panchal, the pathologist who performed the victim's autopsy, testified:
He found evidence of healing injuries and pneumonia in both of the victim's lungs.  (RT
999-1001).  When a person is not mobile, the person is predisposed to get an infection.
(RT 1003).  Given the trauma the victim received which made her immobile, the
infection in the victim's lungs was due to her injuries.  (RT 1003, 1015-16, 1023).  The
victim died from the consequences of her "multiple sharp force injuries and blunt force

---

[10]Petitioner asserted at trial, as he does here, that the victim's brain injury was due to a
lack of oxygen during her emergency surgery.  (RT 1526-28).  On cross-examination, Dr. Rhee
noted that while it is entirely possible that a patient could not be provided with adequate oxygen
during an operation which could cause brain damage, that did not occur with the victim.  (RT
988-89, 991, 994).

trauma" i.e., the multiple stab wounds and being run over by a car.  (RT 1014-15, 1020).[11]

**B.    Defense Case**

**1.    Psychologist's Testimony**

Forensic psychologist, Dr. Haig Kojian, testified as an expert witness for the defense.  (RT 1204-46).  Dr. Kojian attested:  In domestic violence situations, both individuals have to realize they have to "de-escalate the situation."  (RT 1208-09).  Oftentimes a victim knows how to push the buttons of the aggressor – especially where the aggressor is on parole or probation.  (RT 1209).  Based on testing that Dr. Kojian performed on petitioner, there was evidence that petitioner has memory deficits most likely because of an extensive history of alcoholism, and deficits in his ability to plan, organize, think abstractly, and "lay reign" to impulsive behavior.  (RT 1211-13).  These findings were significant given petitioner's history of head injury and neurocognitive compromise and substance abuse.  (RT 1213-14).[12]  Petitioner has bipolar disorder with antisocial personality disorder.  (RT 1215, 1235).[13]

Dr. Kojian further testified:  He reviewed medical records for petitioner from November 1999 concerning an incident where petitioner was decompensated, distraught, depressed and suicidal.  (RT 1216-17).  Petitioner was held against his will and treated with a number of antipsychotic medications.  (RT 1217).  Petitioner reported to Dr.

---

[11]On cross-examination, Dr. Panchal confirmed that if the victim had not been given sufficient oxygen during her surgery at the outset of her treatment, this could have caused the victim's hypoxia and brain damage.  (RT 1017-18).  Dr. Panchal also opined that if the victim had not had the surgery, she would have died.  (RT 1019).  He recalled no evidence in the medical record of any problem with oxygen during the victim's surgery.  (RT 1019).  He opined that the victim suffered hypoxia from blood loss in part because of the trauma to her spleen.  (RT 1021-22).

[12]Petitioner reported a family history of domestic violence and substance abuse.  Petitioner's father was an alcoholic with a severe temper problem who beat petitioner's mother.  (RT 1222).

[13]Dr. Kojian acknowledged that deceit and manipulation are central features of antisocial personality disorder.  (RT 1235).

Kojian that he later was treated with several antidepressants and antipsychotic medications that petitioner was not taking as of August 13, 2002. (RT 1218-19, 1224). Instead, petitioner reported using drugs excessively. (RT 1219, 1225). When a person with bipolar disorder does not take medicine but instead takes drugs, the person is exceptionally susceptible to episodes of decompensation and difficulty functioning. (RT 1219-20).

As to the incident on August 13, 2002, Dr. Kojian testified:  Petitioner told him that he did not remember much about the incident. (RT 1224). Petitioner recalled being with the victim that day and later being arrested, but purportedly could remember nothing in between and did not know why he was being arrested. (RT 1224). As the police report from petitioner's arrest indicated that petitioner was cooperative, and not acting in a bizarre manner, Dr. Kojian suggested that petitioner was at least lucid and rational to the point he knew what was going on around him when he was arrested. (RT 1225-26). Dr. Kojian acknowledged that there was no evidence in the record to suggest that petitioner was irrational or decompensated at the time of the incident. (RT 1228; see also RT 1230 (paragraph from Dr. Kojian's report providing: "there is little evidence to suggest that [petitioner] was suffering under the duress of a significant mental illness at the time of the reported incident")).

### 2.   Petitioner's Testimony

Petitioner testified in his defense to the following:

Petitioner learned he had bipolar disorder in 1994. (RT 1328). At that time, he was prescribed Zoloft and Imipramine among other medications. (RT 1328). He witnessed his father drinking and hitting his mother. (RT 1329). He sniffed paint from age 10 to 14. (RT 1330). He then used marijuana, alcohol, PCP, and eventually cocaine every day. (RT 1330-31). At the height of his consumption, he would consume at least $40 in cocaine daily. (RT 1331).

He was convicted of robbery in 1991. (RT 1331, 1342). He was taking drugs at the time. (RT 1331). On January 24, 1997, two weeks after he married the victim, he

punched her in the face several times and choked her resulting in a spouse abuse conviction. (RT 1331-32, 1342). On May 19, 2001, he again hit the victim, giving her a bloody nose. (RT 1332, 1343-44).[14] When he had his mental episode in 1999 he was not taking his medication but was taking drugs. (RT 1332). He was hospitalized for two weeks. (RT 1332-33).

He began to have contact with the victim about two weeks before August 13, 2002. (RT 1334). In that time, he learned that the victim had given birth to a baby fathered by another man. (RT 1334). He and the victim were trying to patch up their marriage. (RT 1335). He was not then taking his medication but was using alcohol and cocaine. (RT 1336). The victim did not use drugs, but sold drugs with Coleman. (RT 1336).[15]

Petitioner visited the victim at the motel on August 12, 2002. (RT 1336). There he saw another man in the victim's room playing a video game. (RT 1337). The victim told petitioner the man was a friend of the family. (RT 1337). Petitioner asked the victim why she let a man in when he was not present. (RT 1337). He said he felt like ///

---

[14]The prosecution introduced evidence of prior domestic violence incidents involving petitioner and the victim. Pomona Police Officer Paul Fernandez testified that he responded to a domestic violence call involving the victim and petitioner on January 24, 1997. (RT 922-24). The victim reported that petitioner had punched her in the face and head several times and had choked her following an argument over an ex-boyfriend. (RT 924-25, 927-28). The victim suffered swelling to her forehead, the left side of her face, and both of her lips and had some redness or discoloration to her neck. (RT 925). There was blood on the victim's shirt. (RT 926).

Chino Police Officer Rodolfo Hernandez testified that he responded to a domestic violence call involving the victim and petitioner on May 19, 2001. (RT 929-32). The victim appeared disheveled and had a two-inch oblong redness on the right side of her face. (RT 931). The victim reported that she had an argument with petitioner who struck her in the face with his fists, then fled with her cell phone. (RT 932).

[15]Coleman denied that petitioner was ever at the motel under the influence of drugs, did drugs at the motel, or wanted money from the victim to buy drugs. (RT 676-77). She also denied the she, the victim and the petitioner were in involved in any way with drugs. (RT 677).

the victim was being disloyal to him and cheating on him.  (RT 1337).  The victim told petitioner to leave and he did.  (RT 1337).

Petitioner returned to the victim's room on August 13, 2002 to see if the man was still there and to ask about money the victim had for petitioner.  (RT 1338-39).  Petitioner had just finished smoking a lot of cocaine, did not have any money, was paranoid and edgy, and needed more drugs to take the edge off.  (RT 1338, 1341).  Petitioner did not want the victim to know he was smoking cocaine again.  (RT 1338).  He arrived at the motel and asked for his money, whereupon the victim said she could tell petitioner was using drugs again.  (RT 1338-39).  The victim refused to give petitioner money or drugs.  (RT 1339).   Petitioner then went to his car and got a knife that he had put in his car earlier that day, and slashed the victim's tires.  (RT 1339-40, 1345-46, 1348).  Petitioner wanted the victim to come out of the motel room or open the door so he could see if the man who was there the day before was present.  (RT 1346-47).  Petitioner was going to his car to leave when the victim started calling him names, saying he was a base head, and saying that that was why she "f--ked Dillard."  (RT 1340).  At that point, petitioner blacked out and did not remember anything until he was arrested.  (RT 1340, 1350-51).[16]

## IV.   STANDARD OF REVIEW

A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

---

[16]Petitioner's mother, Lula Baker, also testified in petitioner's defense.  She stated: Petitioner's father was physically and verbally abusive and an alcoholic.  (RT 1316, 1319, 1324).  Petitioner's father broke Lula's jaw during her first trimester of pregnancy with petitioner.  (RT 1317).  The abuse continued after petitioner was born.  (RT 1317-18).  Petitioner's father broke Lula's ribs in front of petitioner.  (RT 1318).  When petitioner was two years old, his father hit petitioner in the head with a whiskey bottle.  (RT 1319).  She saw petitioner sniffing paint regularly from when petitioner was about 12 years old.  (RT 1320-22).  She later found out that petitioner was using cocaine.  (RT 1322).  Petitioner told her he would never hit a woman.  (RT 1326).

Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[17]

"[C]learly established Federal law" refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Although the statutory formulation restricts federal law to Supreme Court precedent, Ninth Circuit precedent may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law, and may also help determine what law is clearly established. Sims v. Rowland, 414 F.3d 1148, 1151 (9th Cir.), cert. denied, 546 U.S. 1066 (2005) (citations and quotation marks omitted).

A state court decision is "contrary to" clearly established federal law if: (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts. . . materially indistinguishable" from a decision of the Supreme Court but reaches a different result. Early v. Packer, 537 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" prong of section 2254(d)(1), a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. Williams v. Taylor, 529 U.S. at 413.

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" Id. at 520-21 (citation omitted); see also Clark v. Murphy, 331 F.3d 1062, 1068 (9th Cir.) (under

_____

[17]The California Supreme Court's denial of review without comment generally constitutes an adjudication on the merits of any federal claims, thereby subjecting such claims to review in federal habeas proceedings. Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992), cert. denied, 510 U.S. 887 (1993).

"unreasonable application" clause, federal habeas court may not issue writ simply because it concludes in its independent judgment that relevant state court decision applied clearly established law erroneously or incorrectly; rather, application must be objectively unreasonable), <u>cert. denied</u>, 540 U.S. 968 (2003)).  The habeas petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  <u>Woodford v. Viscotti</u>, 537 U.S. 19, 24 (2002).

In applying these standards, federal courts look to the last reasoned state court decision.  <u>See</u> <u>Davis v. Grigas</u>, 443 F.3d 1155, 1158 (9th Cir. 2006) (citation and quotations omitted).  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991); <u>see also</u> <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (where California Supreme Court denies review without comment, federal courts "look through" unexplained California Supreme Court decisions to last reasoned decision as basis for state court's judgment), <u>cert. denied</u>, 534 U.S. 944 (2001).

Here, the California Court of Appeal's decision is the last reasoned decision.

## V.   DISCUSSION

### A.   Petitioner's Sufficiency of the Evidence Claim Does Not Merit Habeas Relief

Petitioner contends that the evidence was insufficient to support his second degree murder conviction.  Specifically, petitioner claims there was insufficient evidence to show he harbored express malice and actually caused the victim's death.

#### 1.   Background

Petitioner asserts:  (1) at the time of the offense he was intoxicated with alcohol and cocaine and had failed to take his prescribed psychotropic medications for his bipolar disorder so he could not form the requisite intent; and (2) the location of the stab wounds and the fact that petitioner ran over the victim purportedly "demonstrates the hot

blooded blind anger with which petitioner spontaneously acted rather than actual intent
to kill his wife." (Reply at 3-4) (quoting from Lodged Doc. A3 at 32).[18]   As to
causation, petitioner asserts there was insufficient evidence that petitioner proximately
caused the victim's death because there was "substantial circumstantial [] evidence of
grossly improper medical treatment." (Reply at 16-17) (arguing that a lack of blood
flow to the victim's brain occurred during surgery and resulted in the brain injury that
led to the paralysis, intubation, and resulting pneumonia). The Court of Appeal rejected
these assertions, ruling that the evidence to support petitioner's second degree murder
conviction was "ample." (Answer Ex. A at A48-49).

    The Court of Appeal considered whether the record, reviewed in the light most
favorable to the judgment, "disclose[d] substantial evidence – that is, evidence that [was]
reasonable, credible, and of solid value – such that a reasonable trier of fact could find
the defendant guilty beyond a reasonable doubt." (Answer Ex. A at A48) (citing People
v. Stanley, 10 Cal.4th 764, 792 (1995), cert. denied, 517 U.S. 1208 (1996)). Applying
that standard, the Court of Appeal found substantial evidence, reasoning:

        Contrary to appellant's claim, there was ample evidence establishing
express malice, which exists 'when there is manifested a deliberate
intention unlawfully to take away the life of a fellow creature.' ([Cal. Penal
Code] § 188.) After [the victim], who was unarmed, fell to the ground,
appellant stabbed her with a large knife numerous times, inflicting multiple
injuries, including two 'squarely right [in] the middle of [her] breasts'
which wounds were as deep as the length of the knife blade. Not content,
he then drove over her body at least three times and left the car only when it
became stuck over her body. Appellant's removal of the ignition key

_____

[18]Under California law, "[a] defendant can be convicted of second degree rather than first
degree murder if he subjectively experienced heat of passion or provocation at the time of the
murder, such that it negated deliberation or premeditation." Daniels v. Woodford, 428 F.3d
1181, 1208 (9th Cir. 2005), cert. denied, 127 S. Ct. 2876 (2007) (citing People v. Fitzpatrick, 2
Cal. App. 4th 1285, 1295-96 (1982)).

1    prevented a potential rescuer from immediately moving the car off [the

2    victim].

3        Appellant contends [the victim's] death was caused by supervening

4    'grossly improper medical treatment' rather than from his conduct.  He

5    argues [the victim] died from pneumonia, to which she was rendered

6    susceptible due to brain damage caused by insufficient oxygen being

7    delivered during surgery.  He also argues her death was proximately caused

8    by unspecified 'gross maltreatment' by other medical personnel.  His

9    contention is unsupported by the record.  No evidence was presented from

10    which an inference could be drawn that 'the sole cause of death' was

11    'grossly improper medical treatment.'  As we pointed out earlier,

12    speculation is not evidence.

13 (Answer Ex. A at A49 (citations omitted)).

14            **2.**      **Discussion**

15      On habeas corpus, the court's inquiry into the sufficiency of evidence is limited.

16 Evidence is sufficient unless the charge was "so totally devoid of evidentiary support as

17 to render [petitioner's] conviction unconstitutional under the Due Process Clause of the

18 Fourteenth Amendment."  Fish v. Cardwell, 523 F.2d 976, 978 (9th Cir. 1975), cert.

19 denied, 423 U.S. 1062 (1976) (citations and quotations omitted).  The standard of review

20 on a sufficiency of the evidence claim has long been whether, "after viewing the

21 evidence in the light most favorable to the prosecution, any rational trier or fact could

22 have found the essential elements of the crime beyond a reasonable doubt."  Jackson v.

23 Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Wright v. West, 505

24 U.S. 277, 284 (1992); Gonzalez v. Knowles, 515 F.3d 1006, 1011 (9th Cir. 2008); Schell

25 v. Witek, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (each discussing Jackson

26 standard for sufficiency of evidence claims).

27 ///

28

A conviction cannot be disturbed unless the court determines that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Wright, 505 U.S. at 284; Jackson, 443 U.S. at 319, 324.  The court must respect the province of the trier of fact to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the trier of fact resolved all conflicts in a manner that supports the finding of guilt. Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997) (citation and quotations omitted); see also United States v. Stanton, 501 F.3d 1093, 1099 (9th Cir. 2007) (discussing deference owed to jury determinations).[19]

Sufficiency of the evidence claims are judged by the elements defined by state law.  Jackson, 443 U.S. at 324 n.16.  To find petitioner guilty of second degree murder under California law, the jury had to find that petitioner unlawfully killed the victim,[20]

---

[19]The Ninth Circuit recently held that where a state court fails to analyze each of the essential elements of the substantive state crime, but rather finds only that a "reasonable" jury "could have been convinced of the defendant's guilt beyond a reasonable doubt," the decision is "contrary to" Jackson.  See Brown v. Farwell, ___ F.3d ___, 2008 WL 2789254 *6 (9th Cir. July 21, 2008) (finding that such a standard of review is not an application of the Jackson standard because it does not assess the essential elements of the crime).  In Brown, the Nevada Supreme Court had simply recited facts cumulatively without analyzing whether those facts met the essential elements of the crime.  Id.  Analyzing the facts concerning the essential elements, after excluding unreliable testimony, the Brown court found that not all of the elements of the crime had been proven.  Id. at *8.  Here the Court of Appeal, unlike the Nevada Supreme Court in Brown, discussed the essential elements at issue (i.e., express malice and causation) in finding sufficient evidence supported petitioner's murder conviction.

Assuming, arguendo, the Court of Appeal's determination that substantial evidence supported petitioner's murder conviction was "contrary to" clearly established Federal law for failure more explicitly to discuss the essential elements of second degree murder, the Court's inquiry does not end.  The court reviews petitioner's claim de novo.  See Frantz v. Hazey, ___ F.3d ___, 2008 WL 2600143 *7 (9th Cir. Jan. 22, 2008) ("[I]f there is [§ 2254(d)(1)] error, we must decide the habeas petition by considering de novo the constitutional issues raised."); see also Williams v. Taylor, 529 U.S. at 406 (when habeas court identifies a "contrary to" error, it "will be unconstrained by § 2254(d)(1)").  Here, any distinction is academic because petitioner's claim fails under either standard of review.

[20]"A killing is unlawful when it is not justified, as by self defense, or excused, as by accident or misfortune."  People v. Blakeley, 23 Cal.4th 82, 94-95 (2000) (dissenting opinion) (internal citations omitted).

with express malice aforethought.[21]  See Cal. Penal Code §§ 188, 189; People v. Robertson, 34 Cal.4th 156, 164 (2004) (discussing elements of second degree murder); see also RT 1563 (prosecution noting that it was proceeding only on an express malice theory, so jury instruction on implied malice was not given); RT 1585-88 (jury instructions on murder as given).  The jury also had to find that, by his acts, petitioner caused the victim's death.  See People v. Cervantes, 26 Cal.4th 860, 866 (2001) (quoting CALJIC 3.40:  "In homicide cases, a 'cause of death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.'"); RT 1603-04 (CALJIC 3.40 as given).  The evidence was sufficient for the jury to find each of these elements.

As summarized above, the evidence adduced at trial showed that petitioner armed himself with a knife and slashed the victim's tires to lure her out of her motel room.  (RT 1339-40, 1345-48, 1263-65).  When the victim came out, petitioner turned and attacked the unarmed victim, stabbing her in the torso multiple times until she fell to the ground, and leaving the knife buried in her back.  (RT 661-62, 685-87, 693-95, 704, 729, 739-39, 970-74, 980, 1271-73).  Petitioner then got in his car and drove back and forth over the victim until his car became stuck on her body.  (RT 664-65, 689, 695, 701-02, 710-14, 717, 740).  When the car became stuck, petitioner did not seek help but instead walked away from the trapped victim, taking his car keys with him.  (RT 665-67, 669-72, 693-

///

---

[21]Malice aforethought is express when "there is manifested a deliberate intention unlawfully to take away the life of a fellow creature."  Cal. Penal Code § 188.  "A defendant lacks malice and is guilty of voluntary manslaughter in limited, explicitly defined circumstances: either when the defendant acts in a sudden quarrel or heat of passion or when the defendant kills in unreasonable self-defense – the unreasonable but good faith belief in having to act in self-defense."  People v. Lasko, 23 Cal.4th 101, 108 (internal citations and quotations omitted), cert. denied, 531 U.S. 951 (2000); see also People v. Wright, 35 Cal.4th 964, 981 (2005) (explaining that "malice" is a narrower construct than "intent to unlawfully kill," "implying intent combined with an absence of the factors that would reduce the killing to manslaughter") (citing People v. Rios, 23 Cal.4th 450, 460 (2000)); Cal. Penal Code § 192(a) (defining voluntary manslaughter).

94, 702-03, 972-74, 980).  No witness testified that petitioner attacked the victim in self-defense; petitioner suffered only a "slight small cut" to his right hand.  (RT 960, 963).

The emergency room doctor who treated the victim testified that she would have died from her stab wounds had she not received medical treatment.  (RT 982).  Moreover, doctors testified that the victim lost so much blood from the attack that she suffered resulting brain damage that led to her paralysis, intubation, and eventual pneumonia and death.  (RT 977-81, 996, 1003-15, 1020, 1023).

Given this evidence, a rational juror could have found minimally that, in the circumstances of this case, the victim was killed unlawfully, as a result of petitioner's intentional act of stabbing and running her over.[22]  See, e.g., People v. Williams, 185 Cal. App. 2d 457, 461 (1960) (ample evidence to establish killing unlawful where defendant admitted stabbing victim when he broke through her door and entered her home against her will).  Although petitioner suggested at trial that the victim provoked petitioner's attack by saying she "f--ked Dillard" (RT 1340, 1536, 1540-43),  petitioner has not asserted that the victim's killing was somehow justified or excused as a result.  See People v. Lasko, 23 Cal.4th at 108 (noting that provocation can make an intentional unlawful killing voluntary manslaughter rather than murder; voluntary manslaughter, however, is an unlawful killing).

A rational juror also could have found that, in so stabbing and running over the victim, petitioner acted with a deliberate intent to kill the victim as is necessary to support a murder conviction.  See, e.g., People v. Bolden, 29 Cal.4th 515, 561 (2002), cert. denied, 538 U.S. 1016 (2003) (finding evidence sufficient to show an intent to kill where, "[i]n plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill" where victim died from a single, forceful stab wound to the back); People v. Moore, 96 Cal. App. 4th 1105, 1114 (2002) (finding the fact that the defendant

---

[22]The jury found true special allegations that petitioner personally used a deadly weapon (i.e., the knife and the car) and inflicted great bodily injury on the victim.  (CT 185-88).

"stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable area of the body" and "stabbed her with all his might and effort" sufficient to support a specific intent to kill).

Petitioner argues that he could not have formed the requisite intent to kill because he was under the influence of alcohol and cocaine and was not taking his psychotropic medicines at the time of the attack.  In California, "[v]oluntary intoxication is not a true defense.  Rather, intoxication is a species of mental state evidence which, in a homicide case, can show that the defendant 'did not in fact form the intent unlawfully to kill (i.e., did not have malice aforethought)."  Miller v. Terhune, 510 F.Supp.2d 486, 495 (E.D. Cal. 2007) (citation and internal quotations omitted).  Complete impairment is not needed for alcohol to render a person incapable of forming the requisite mens rea.  Id.

Petitioner presented evidence of his alleged diminished capacity to the jury.  (RT 1211-15, 1219-20, 1235, 1328-31, 1336, 1338, 1340-1341, 1350-51).  However, while petitioner testified that he had smoked cocaine on the night of the attack (RT 1338, 1341), petitioner's expert admitted that there was little evidence to suggest that petitioner was irrational or decompensated at the time of the incident.[23]  (RT 1228).  Responding

---

[23]The court adequately instructed the jury with CALJIC 3.32, 4.21.1 and 4.22 on how it should view evidence of mental disease and voluntary intoxication in determining whether petitioner harbored the specific intent to kill the victim.  (CT 168-70).  For example, CALJIC 4.21.1 as given provides in part:

> [I]n the crime of Murder, charged in Count 1, or the lesser crimes of Voluntary Manslaughter, Attempted Murder and Attempted Voluntary Manslaughter, a necessary element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of the crimes set forth elsewhere in these instructions.
>
> If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not the defendant had the required specific intent or mental state.
>
> If from all the evidence you have a reasonable doubt whether the defendant had the specific intent or mental state, you must find that the defendant did not have the specific intent or mental state.  (CT 169, RT 1612-14).

police officers testified that petitioner was cooperative, appeared to understand requests, and did not appear to be under the influence of drugs or alcohol.  (RT 961-62, 1282).  It was for the jury to weigh the evidence of petitioner's ability to form the requisite intent.  There was substantial evidence from which petitioner's jury could have determined that petitioner formed the requisite intent to murder the victim.  See People v. Cunningham, 25 Cal.4th 926, 1010 (2001) (finding substantial evidence from which a rational jury could have found an intent to kill beyond a reasonable doubt where defendant claimed he was intoxicated, but evidence was inconclusive as to how much defendant had to drink prior to the murder, and there was no testimony that he behaved as if intoxicated; rather, evidence suggested defendant acted with purpose, demanding money from his victim before shooting him), cert. denied, 534 U.S. 1141 (2002); see also People v. Boyer, 38 Cal.4th 412, 468-70 (rejecting defendant's argument that chronic drug abuse, past head injuries, and the effects of voluntary intoxication were a complete defense to his crime and that the jury should have been so instructed, given the "very strong evidence" suggesting that the defendant killed his victim while conscious in the course of a robbery where the defendant "seemed mentally normal" and his activity following the homicides "appeared entirely rational and goal-directed"), cert. denied, 127 S. Ct. 556 (2006).

As was its province, the jury rejected petitioner's theory of diminished capacity, finding petitioner harbored the specific intent to kill the victim.  It is not for this court to second-guess the jury or to reweigh the evidence.  Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for the jury to find that petitioner harbored the specific intent to kill when he stabbed and ran over the victim.

Finally, a rational juror could have found that by stabbing and running over the victim, petitioner caused the victim's death by setting in motion the chain of events that resulted in her death.  The pathologist testified that the victim died as a result of the wounds petitioner inflicted.  (RT 1014-15, 1020).  The victim's treating physician opined

that the victim suffered brain injury from lack of oxygen that led to her eventual pneumonia from the initial assault.  (RT 979-80, 996).  Had petitioner not stabbed and run over the victim, she would not have died.  "If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death."  People v. Roberts, 2 Cal.4th 271, 312, cert. denied, 506 U.S. 964 (1992); see also People v. Stanley, 39 Cal.4th 913, 946 (2006), cert. denied, 127 S. Ct. 1493 (2007) (applying Roberts to uphold finding of causation where defendant claimed victim's death was due to unforeseeable medical malpractice, but evidence established that victim, who suffered multiple stab wounds and lost seven quarts of blood as a result of the attack, suffered from severe edema (or swelling) which was a "medically foreseeable and explainable condition" resulting from attempts to keep the victim hydrated and alive).  While petitioner asserts now, as he did at trial, that medical malpractice caused the victim's death, the evidence viewed in the light most favorable to the prosecution was sufficient for the jury to conclude that the victim's pneumonia was a "medically foreseeable and explainable condition" resulting from the attempts to keep her alive after the attack.

For the foregoing reasons, the evidence was sufficient to support petitioner's second degree murder conviction.  Petitioner is not entitled to habeas relief on his first claim.

///
///
///
///
///
///
///
///

## B.   Any Errors in The Trial Court's Jury Instructions Do Not Merit Habeas Relief[24]

Petitioner contends that the trial court erred in instructing the jury with causation instructions which purportedly enabled the jury to find petitioner guilty of second degree murder without the requisite malice, and impermissibly lightened the prosecution's burden of proof.  (Petition at 6-7; Reply at 20 (incorporating by reference Lodged Doc. A3 at 39-46)).  Petitioner maintains that the "modified" CALJIC 3.40 used here, allowed the jury to adopt a strict liability analysis of causation rather than proximate cause, and omitted any proper consideration of whether medical maltreatment was a superseding cause of the victim's death.  (Lodged Doc. A3 at 42-43).[25]   Similarly, petitioner maintains that "modified" CALJIC 3.41 and CALJIC 8.57 omitted consideration of whether medical maltreatment was a superseding intervening cause of the victim's death.

///

///

---

[24]Respondent also asserts that petitioner's jury instruction claim is procedurally defaulted in light of the California Court of Appeal's conclusion that the claim was forfeited by the lack of a contemporaneous objection at trial.  (Answer at 16-18).  In the interest of judicial economy, this court will address petitioner's claim on the merits rather than perform the procedural default analysis.  See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts "are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar").

[25]CALJIC 3.40 as given provides:

> To constitute the crime of murder or voluntary manslaughter there must be in addition to the death of a human being an unlawful act which was the cause of that death.

> The criminal law has its own particular way of defining cause.  A cause of death of a human being is an act that sets in motion a chain of events that produces a direct, natural and probable consequence of the act of death of a human being and without which death would not have occurred.

(CT 157; RT 1603-04).  The instruction was "modified" only to fill in the blanks with the crimes for which petitioner was charged.

1  (Lodged Doc. A3 at 43-45).[26]   Petitioner maintains that "modified" CALJIC 8.57

2  allowed the jury to believe that if death followed the stabbing, then petitioner was

3  responsible and any medical maltreatment was irrelevant because the jury was never told

4  that a superceding cause could interrupt the chain of events that produce death.  (Lodged

5  Doc. A3 at 45).  Finally, petitioner asserts that each of the three disputed instructions

6  also improperly allowed the prosecution to "pinpoint specific evidence on a disputed

7  question of causation and invite[d] the jury to draw inferences favorable to the

8  prosecution."  (Lodged Doc. A3 at 44).

9       The Court of Appeal rejected petitioner's assertions, noting that the jury

10  instructions were correct statements of the law.  (Answer Ex. A at A46-47 (citing People

11

12       [26]CALJIC 3.41 as given provides:

13       There may be more than one cause of the death of a human being.  When

14  the conduct of two or more persons contributes concurrently as a cause of the
    death, the conduct of each is a cause of death of a human being if that conduct

15  was also a substantial factor contributing to the result.  A cause is concurrent if it
    was operative at the moment of the death of a human being and acted with another

16  cause to produce the death.

17       If you find that the defendant's conduct was a cause of death to another

18  person, then it is no defense that the conduct of some other person contributed to
    the death.

19

20  (CT 158; RT 1604).  This instruction was "modified" only to fill in the blanks with death of a
    human being.

21

22  CALJIC 8.57 as given provides:

23       Where the original injury is a cause of death, the fact that the immediate
    case of death was the medical or surgical treatment administered or that the

24  treatment was a factor contributing to the cause of death will not relieve the
    person who inflicted the original injury from responsibility.

25

26       Where, however, the original injury is not a cause of death and the death
    was caused by medical or surgical treatment or some other cause, then the

27  defendant is not guilty of an unlawful homicide.

28  (CT 158; RT 1604-05).  CALJIC 8.57 was not modified.

v. Bland, 28 Cal.4th 313, 334-35, 38 (2002)).  With respect to petitioner's claim that the instructions improperly omitted any consideration of medical maltreatment as a superseding cause of death, the Court of Appeal rejected petitioner's claim for two reasons:  (1) petitioner assertedly forfeited his claim because he did not object to the jury instructions at trial nor request any clarifying or amplifying instructions; and (2) no evidence was presented from which an inference could be drawn that the victim's surgery or medical treatment (or both) were "the sole cause" of her death, as would be required to discharge liability for homicide under Roberts, 2 Cal.4th at 312.  (Answer Ex. A at A47-48).

### 1.    Pertinent Law

To merit relief when an allegedly erroneous jury instruction is given, or an instruction is omitted, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (state court's failure to give jury instruction "does not alone raise a ground cognizable in a federal habeas corpus proceeding").  "Where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson, 431 U.S. at 155; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997), cert. denied, 522 U.S. 1079 (1998).  Claims of instructional error must be evaluated in the context of the instructions as a whole, not in artificial isolation.  Estelle, 502 U.S. at 72; United States v. Frady, 456 U.S. 152, 169 (1982) (citation omitted).  Even assuming an instructional error, however, a habeas petitioner is not entitled to habeas relief unless such error had a "substantial and injurious effect or influence in determining the jury's verdict."  See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993); see also Clark v. Brown, 450 F.3d 898, 905 (9th Cir.) ("A habeas petitioner must show that the alleged

instructional error 'had substantial and injurious effect or influence in determining the jury's verdict.'"), cert. denied, 127 S. Ct. 555 (2006).

## 2.   Discussion

In petitioner's case, the trial court properly instructed the jury on the elements of homicide and murder, including second degree murder, voluntary manslaughter and causation.  (CT 137-51, 157-59 (CALJIC 8.00, 8.10, 8.11, 8.20, 8.30, 8.70, 8.71, 8.75, 8.40, 8.42, 8.43, 8.44, 8.50, 3.40, 3.41, and 8.57 as given)); see also People v. Blakeley, 23 Cal.4th at 87-88 (discussing elements of murder and voluntary manslaughter); People v. Bland, 28 Cal.4th at 335 (providing that definition of cause included in CALJIC 3.40 is a correct statement of law and that CALJIC 3.41 should be given when there is more than one cause of injury or death); People v. Stanley, 39 Cal.4th at 946 (affirming that "[i]f a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death," quoting Roberts, 2 Cal.4th at 312).

When read together,[27] the instructions allowed the jury to find petitioner not guilty of murder if the jury believed that the medical treatment the victim received was the sole cause of her death.  The jury simply did not believe the medical care the victim received solely caused her death.  That the trial court did not go one step further and instruct the jury that "when medical maltreatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause," Roberts, 2 Cal.4th at 295, does not warrant relief.  The failure to pinpoint such a finding did not so infect the entire trial that the resulting conviction violates due process.  Here, as in Roberts and as noted by the Court of Appeal, the record is devoid of any evidence of grossly improper medical treatment as could constitute a supervening cause of death.  The pathologist testified that the victim died as a result of

---

[27]Francis v. Franklin, 471 U.S. 307, 315 (1985) (court must review challenged jury instruction in context to determine if the language reasonably could be understood as relieving the State of its burden of proof).

the injuries she received from petitioner.  (RT 1014-15, 1020).  While the victim's treating physician opined that brain injury could result from a lack of blood during surgery, the doctor said that this did not happen in the victim's case.  (RT 988-89, 991, 994).  On this record, petitioner's speculation about the quality of care the victim received is insufficient to demonstrate that any further instruction on causation may have been necessary.[28]

For all the foregoing reasons, petitioner's jury instruction claim does not merit relief.  The Court of Appeal's rejection of petitioner's jury instruction claim was neither contrary to nor an unreasonable application of clearly established federal law.

### C.    Petitioner's Claim that His Sentence Violates *Blakely* Does Not Merit Habeas Relief

Petitioner contends the sentencing court imposed upper term sentences for counts two, three, and four, in violation of Blakely v. Washington, 542 U.S. 296 (2004). (Petition at 7; Reply at 23-24; Lodged Doc. A7 at 1-8).  Petitioner asserts that the trial court violated his right to a verdict based on proof beyond a reasonable doubt by sentencing petitioner based on "circumstances in aggravation," which were not encompassed in the jury's verdict or in petitioner's admissions, and which petitioner asserts were found by the court applying a preponderance of the evidence standard. (Reply at 2).  For the reasons discussed below, this contention does not merit relief.

### 1.    Background

On August 26, 2003, petitioner waiving his right to a jury trial on the existence of his prior convictions.  On August 28, 2003, petitioner also waived his right to a court trial on the existence of his prior convictions and admitted:  (1) he had previously been convicted of robbery, a serious felony; (2) he had previously been convicted of spousal

---

[28]For all of the counts, the jury found true allegations that petitioner personally used a deadly weapon and inflicted great bodily injury on the victim.  (CT 185-88).  By its second degree murder verdict, the jury also rejected petitioner's assertion that he did not harbor the requisite intent to kill the victim when he attacked.  From the jury's verdict, it is clear that the jury concluded petitioner's intentional acts were also a cause of the victm's death.

abuse; and (3) he "did not remain free of prison custody" and did commit an offense resulting in a felony conviction during a period of five years subsequent to the conclusion of each term.  (RT 1809, 2101-05).

At the August 28, 2003, sentencing hearing, the trial court imposed the upper term for count two based on findings that:  (1) petitioner had served a prior prison term; (2) petitioner posed a substantial danger to society; and (3) the victim in this case was particularly vulnerable.  (RT 2118).

The trial court imposed the upper terms for counts three and four based on findings that:  (1) petitioner was on parole at the time of the offense; (2) petitioner posed a substantial danger to society; and (3) the victim in this case was particularly vulnerable.  (RT 2119).

The court stayed the sentences on counts two, three, and four pursuant to Penal Code section 654, which provides that an act punishable in different ways by different provisions of law shall be punished under the provision that provides the longest potential term of imprisonment.  (RT 2119); see also Cal. Penal Code § 654(a).

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court held that the "statutory maximum" for Apprendi purposes "is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant . . . ."  Blakely, 542 U.S. at 303 (original emphasis).

In his direct appeal to the Court of Appeal, petitioner alleged that the sentencing court imposed an upper term sentence in violation of Blakely.  (Lodged Doc. A7).  At the time the Court of Appeal affirmed petitioner's conviction, the issue of whether California's determinate sentencing law would survive Blakely scrutiny was pending

before the California Supreme Court.  (Answer Ex. A at A53).[29]  Relying on Almendarez-Torres v. United States, 523 U.S. 224, 239, 246 (1998),[30] the Court of Appeal found that the trial court's reliance on petitioner's prior convictions as a sentencing factor did not violate petitioner's right to a jury trial.  (Answer Ex. A at A53).  Noting that a single aggravating factor will suffice to sustain the imposition of an upper term, the Court of Appeal upheld the upper term for count two based on the fact that petitioner had served prior a prison term – a fact petitioner admitted at trial.  (Answer Ex. A at A53-54; RT 2104 (petitioner admitting that for each of his two prior convictions he "did not remain free of prison custody")).

The Court of Appeal upheld the upper terms for counts three and four based on the fact that petitioner was on parole at the time he committed the current offense – a fact the court noted under Blakely is a "recidivist factor" properly found by the court, not the jury.  (Answer Ex. A at A55) (citation omitted).  The Court of Appeal also noted that the record contained ample support for the trial court's finding that petitioner was on parole based on the statements at sentencing of the Pomona Parole Office Unit Supervisor who said petitioner was released on parole on July 28, 2002, about two weeks before petitioner committed the current offense.  (Answer Ex. A at A55; RT 2108-10 (supervisor's statements)).

On January 22, 2007, after the California Supreme Court denied petitioner's petition for review, the United States Supreme Court issued its decision in Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856 (2007).  Cunningham held that a California judge's imposition of an upper term sentence based on facts found by the judge (other

---

[29]That pending case was People v. Black, 35 Cal. 4th 1238, 29 Cal. Rptr. 3d 740, 113 P.3d 534 (2005) (Black I), vacated by Black v. California, 127 S.Ct. 1210 (2007).  Black I held that this statutory scheme did not violate the constitutional principles set forth in Apprendi and Blakely.

[30]In Almendarez-Torres, the Court ruled that an indictment was not defective for failure to charge the fact of a prior conviction used as a sentence enhancement, on the ground that the prior conviction was not an element of the offense.  Almendarez-Torres, 523 U.S. at 238-47.

than the fact of a prior conviction) violated the constitutional principles set forth in Apprendi and Blakely.  Cunningham expressly disapproved the holding and the reasoning of Black I.  Cunningham, 127 S. Ct. at 870-71.

### 2.   Discussion

The Ninth Circuit recently has affirmed that a single aggravating factor is sufficient to authorize an upper term sentence under California law.  See Butler v. Curry, 528 F.3d 624, 641-42 (9th Cir. 2008) (citing People v. Black, 41 Cal.4th 799, 812, 815 (2007) (Black II), cert. denied, 128 S. Ct. 1063 (2008)).[31]  Therefore, if at least one of the aggravating factors on which a judge relies in sentencing a defendant to an upper term is established in a manner consistent with the Sixth Amendment, the sentence does not violate the Constitution.  Butler, 528 F.3d at 643.

Here, as to the imposition of the upper term on count two, petitioner fails to establish a constitutional violation.  The trial court imposed the upper term on count two based in part on the fact that petitioner had served a prior prison term.  (RT 2118; see also Cal. R. Ct. 4.421(b)(3) (providing that circumstances in aggravation for sentencing include the fact that the defendant had served a prior prison term)).  As noted above, petitioner, after waiving his right to a jury and court trial on the existence of his prior convictions, admitted he "did not remain free from prison custody" for his prior convictions.  (RT 1809, 2101-05).  A sentencing judge properly may increase a sentence based on facts admitted by a defendant.  Blakely, 542 U.S. at 303; Apprendi, 530 U.S. at 488.

As to counts three and four, the analysis is more complicated.  The trial court imposed the upper terms on such counts based in part, on the fact that petitioner was on parole at the time of the current offense.  (RT 2119; see also Cal. R. Ct. 4.421(b)(4)

---

[31]In Black II, the California Supreme Court concluded that one of the aggravating factors – the existence of prior convictions which were numerous or increasingly serious – had been established in a manner consistent with the Constitution where resolution of the issue could be determined by examining the records of the prior convictions.  Black II, 41 Cal.4th at 819.

(providing that circumstance in aggravation for sentencing include fact that defendant was on probation or parole when the crime was committed).  The Ninth Circuit has ruled that a defendant's sentence cannot be increased by a judicial fact finding that the defendant was on probation at the time of the offense because proof of probationary status is not something that may be determined by examining the records of prior convictions.  Butler, 528 F.3d at 645-46 (noting probationary status determination "can only be made by drawing inferences from the prior conviction documents and by considering facts and circumstances that occurred after the prior conviction"); but see People v. Towne, 44 Cal. 4th 63 (2008) (rejecting Butler and holding that "the federal constitutional right to a jury trial and proof beyond a reasonable doubt on aggravating circumstances does not extend to the circumstance that a defendant was on probation or parole at the time of the offense [.]")[32]  Accordingly, based upon Butler, it appears that the state court erred in failing to submit to the jury at least the issue of whether petitioner was on parole when he committed the current offense to a jury.

However, the state court's sentencing error does not require reversal because any error was harmless.  Washington v. Recuenco, 548 U.S. 212, 221-22 (2006) (sentencing errors subject to harmless error analysis); see also Butler, 528 F.3d at 648 (harmless error standard under Brecht v. Abrahamson, 507 U.S. 619 (1993), will prevent relief unless the error had a "substantial and injurious effect" on a defendant's sentence)).  To grant relief, the court must have "grave doubt" as to whether a jury would have found the relevant aggravating factor beyond a reasonable doubt.  Butler, 528 F.3d at 648.  Here, no such doubt exists.  Whether a jury would have found petitioner was on parole at the time he committed the instant offense beyond a reasonable doubt is clear from the record in this case.

---

[32]While this court is bound by state courts' construction of state law, Estelle v. McGuire, 502 U.S. at 67-68, Butler, 528 F.3d at 642, whether the Sixth Amendment requires submission of certain aggravating factors to a jury under Apprendi is not merely an interpretation of state law. This court must follow Butler.  See Zuniga v. United Can Co., 812 F.2d 443, 450 (9th Cir. 1987) ("District Courts are, of course, bound by the law of their own circuit[.]").

At petitioner's sentencing hearing, the trial court reviewed petitioner's probation report and the State's sentencing memorandum, and heard from a parole unit supervisor who noted that petitioner's field file reflected that petitioner was paroled on July 28, 2002, and was arrested for the current offense on August 13, 2002. (RT 2108-10, 2117; see also CT 201-08 (sentencing memorandum); Cal. Penal Code § 1170(b) (trial court may consider record in the case, probation officer's report, statements in aggravation submitted by the prosecution, and "any further evidence introduced at the sentencing hearing" in choosing the term of imprisonment)). The sentencing proceedings inform the court as to what evidence may have been produced at trial had the question of petitioner's parole status been put before the jury. United States v. Salazar-Lopez, 506 F.3d 748, 755 (9th Cir. 2007) (citation omitted), cert. denied, 128 S. Ct. 2523 (2008). In light of the record here, the court is satisfied that the jury would have found beyond a reasonable doubt that petitioner was on parole at the time he committed the current offense. The result would have been the same had the issue been presented to the jury.[33]

Petitioner is not entitled to relief on his this claim.[34] The Court of Appeal's rejection of petitioner's Blakely claim was neither contrary to nor an unreasonable application of clearly established federal law.

///

///

///

///

---

[33]Because the trial court stayed petitioner's sentence for counts two, three, and four pursuant to California Penal Code section 654, any relief to which petitioner might be entitled on these counts would have no practical effect as the sentence imposed is based on count one, i.e., the second degree murder conviction. (CT 214-15) (Abstract of Judgment); see also Van Geldern v. Field, 498 F.2d 400, 403 (9th Cir. 1974) ("A federal judge may, in his discretion, refuse to entertain a petition for a writ of habeas corpus should he feel that granting the writ will not significantly affect the position of the petitioner").

[34]The court has alternatively analyzed this claim under a de novo standard of review, and reaches the same determination.

## VI.   RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) denying the Stay Motion; and (3) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED:  July 30, 2008

_____
                                  /s/

Honorable Jacqueline Choolijan
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHARLES CARPENTER, | ) | Case No. CV 05-5152 PA(JC) |
| Petitioner, | ) | (PROPOSED) |
| v. | ) | ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| SCOTT KERNAN, Warden, | ) | |
| Respondent. | ) | |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition for Writ of Habeas Corpus by a Person in State Custody (the "Petition"), all of the records herein, and the attached Report and Recommendation of United States Magistrate Judge.  The Court approves and adopts the United States Magistrate Judge's Report and Recommendation.

IT IS HEREBY ORDERED that:  (1) Petitioner's Motion to Hold Federal Habeas Corpus Petition in Abeyance Pending Exhaustion of Potentially Meritorious and Dispositive Claims in State Court is denied; and (2) Judgment be entered denying the Petition and dismissing this action with prejudice.

///

///

1   IT IS FURTHER ORDERED that the Clerk serve copies of this Order, the United

2   States Magistrate Judge's Report and Recommendation, and the Judgment herein on

3   petitioner and counsel for respondent.

4   LET JUDGMENT BE ENTERED ACCORDINGLY.

5

6   DATED: _____

7

8                                   _____

9                                   HONORABLE PERCY ANDERSON
                                    UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                        2

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHARLES CARPENTER, | ) | Case No. CV 05-5153 PA(JC) |
| Petitioner, | ) | (PROPOSED) |
| v. | ) | JUDGMENT |
| SCOTT KERNAN, Warden, | ) | |
| Respondent. | ) | |

Pursuant to this Court's Order Adopting Findings, Conclusions and Recommendations of United States Magistrate Judge,

IT IS ADJUDGED that the Petition for Writ of Habeas Corpus by a Person in State Custody is denied and this action is dismissed with prejudice.

DATED: _____

_____
HONORABLE PERCY ANDERSON
UNITED STATES DISTRICT JUDGE